**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
NORFOLK DIVISION

**UNITED STATES OF AMERICA,**

v.                                      CRIMINAL CASE NO.: 2:01CR41

**JACK LAVELTON NICHOLSON,**

DEFENDANT AND PETITIONER.

**OPINION and ORDER**

This matter is before the Court for determination of whether Attorney Jon Babineau's

("Babineau") actual conflict in representing both Jack Lavelton Nicholson ("Jack" or "Jack

Nicholson" or "Nicholson" or "Defendant") and Lorenzo Butts ("Butts" or "Lorenzo Butts")

adversely affected Babineau's performance at Nicholson's sentencing hearing.  For the reasons

that follow the Court **FINDS** Babineau's actual conflict did not adversely affect his performance

at Nicholson's sentencing hearing.  Accordingly, Defendant's Petition under 28 U.S.C. § 2255

("§ 2255") is **DENIED**.

I. PRE-INDICTMENT HISTORY[1]

A. History of Lorenzo Butt's Crime Organization and the Nicholson Family

In January of 2000, Rudolph Nicholson ("Rudolph Nicholson" or "Rudolph"), the half-

brother[2] of Jack Nicholson provided information to state and federal authorities respecting the

---

[1] This section does not necessarily represent the entire pre-indictment history of the case, but only that which is necessary for consideration of the issue(s) currently before the Court.

[2] While Nicholson refers to Rudolph as his brother, the Nicholson PSR and Rudolph Nicholson indicate Rudolph Nicholson is actually Jack Nicholson's maternal half-brother. Nicholson Presentence Investigation Report ("PSR") at ¶ 42; Doc. 38, Ex. 3 at ¶ 1 (Rudolph Nicholson Affidavit - Not Dated or Signed).  Sandra Nicholson ("Sandra" or "Sandra

illegal activities of Butts and his drug dealing associates. Doc. 38, Ex. 1 at ¶ 1 (Nicholson Affidavit of May 27, 2003);[3] Doc. 38, Ex. 2 at ¶ 4; Doc. 38, Ex. 3 at ¶ 2. Butts and his associates were prosecuted in state and federal court as a result. Doc. 38, Ex. 1 at ¶ 1. Accordingly, Butts "ordered a 'hit'" on Rudolph Nicholson. Doc. 38, Ex. 1 at ¶ 2; Doc. 38, Ex. 3 at ¶ 3; see Doc. 38, Ex. 2 at ¶ 4. On March 2, 2000, Rudolph Nicholson was shot seven times at close range by Butts' son, and was later placed into protective custody because of another attempt on his life while in the hospital. Doc. 38, Ex. 3 at ¶¶ 3-5; Doc. 38, Ex. 1 at ¶ 3; Doc. 38, Ex. 2 at ¶¶ 4, 5. Rudolph received a death threat from Butts' son while incarcerated on a probation violation, following his release from the hospital. Doc. 38, Ex. 3 at ¶ 7.

After Rudolph was shot, Sandra Nicholson "received numerous phone calls telling [her] that [she] was next." Doc. 38, Ex. 2 at ¶ 6. Because of the "threatening phone calls . . . and the newspaper accounts of the drug violence connected with [her] family, [she] lost business at [her] daycare center." Doc. 38, Ex. 2 at ¶ 6.

Around May of 2000, federal agents informed Nicholson that Butts had placed a contract on his life. Doc. 38, Ex. 1 at ¶ 5. Federal agents informed Sandra Nicholson of the "hit" on Nicholson's life as well. Doc. 38, Ex. 2 at ¶ 7. Nicholson stated that he refused to assist these agents, because he did not believe they could protect him in light of the violence committed and attempted against Rudolph Nicholson. Doc. 38, Ex. 2 at ¶ 7.

---

Nicholson"), the mother of both Rudoph and Jack Nicholson, states this as well. Doc. 38, Ex. 2 at ¶¶ 2, 3 (Sandra Nicholson Affidavit dated May 31, 2003). Sandra Nicholson was married to Charles Nicholson ("Charles" or "Charles Nicholson"), the father of Rudolph Nicholson and step-father of Jack Nicholson. Doc. 38, Ex. 2 at ¶¶ 2, 3; Doc. 38, Ex. 3 at ¶ 1.

[3] This affidavit is not notarized.

At the end of July of 2000, Charles Nicholson related to Sandra Nicholson "that his life had been threatened if he did not stop Rudolph from testifying against Lorenzo Butts and his drug associates." Doc. 38, Ex. 2 at ¶ 8.  Charles Nicholson stayed in North Carolina with his daughter, because he was afraid.  Doc. 38, Ex. 2 at ¶ 8.  Keisha Nicholson ("Keisha" or "Keisha Nicholson"), Charles Nicholson's daughter, confirms Charles stayed with her in North Carolina beginning in early August of 2000 until early September of that year.  Doc. 38, Ex. 4 at ¶¶ 1-3 (Keisha Nicholson Affidavit of July 25, 2003).  Keisha relates Charles told her of the threats made against his life concerning whether Rudolph testified in court.  Doc. 38, Ex. 4 at ¶¶ 4, 5.

During the beginning of August of 2000, Sandra Nicholson observed Butts outside her house in a black sports utility vehicle.  Doc. 38, Ex. 2 at ¶ 9.  She recognized him because she had attended school with him.  Doc. 38, Ex. 2 at ¶ 9.  Sandra Nicholson called the Portsmouth Police, but no one responded.  Doc. 38, Ex. 2 at ¶ 9.  Rudolph Nicholson indicates his mother told him about this incident in the fall of 2000.  Doc. 38, Ex. 3 at ¶ 8.

On September 18, 2000, Charles Nicholson was murdered in Portsmouth in retaliation for Rudolph Nicholson's agreement to testify against Butts and his organization.  Doc. 38, Ex. 1 at ¶¶ 4, 6; Doc. 38, Ex. 2 at ¶ 11; see Doc. 38, Ex. 4 at ¶¶ 6, 7.  Charles Nicholson had returned to Portsmouth to deal with health problems which his daughter could not manage.  Doc. 38, Ex. 2 at ¶ 10.  Jack Nicholson immediately told Rudolph Nicholson that his father had been killed by Lorenzo Butts, and that "before [his] father was shot they asked him where his sons were."  Doc. 38, Ex. 3 at ¶ 9.

In October of 2000, another attempt was made on Rudolph's life, and Rudolph survived by wrestling a gun away from his assailant.  Doc. 38, Ex. 3 at ¶ 11.  Rudolph told Jack about this

attempt. Doc. 38, Ex. 3 at ¶ 11. At the time, Jack told Rudolph about a threat made on his life

by "a drug associate of Lorenzo Butts named William Cherry." Doc. 38, Ex. 3 at ¶ 12.

Thereafter, Nicholson fled the area as a result of his fear of Butts and his associates, returning

only to meet with his probation officer.[4] Doc. 38, Ex. 1 at ¶¶ 6-8; Doc. 38, Ex. 2 at ¶¶ 12, 13;

Doc. 38, Ex. 5 at ¶ 6 (Travis Fields Affidavit dated June 4, 2003). At the end of 2000, Nicholson

returned to Portsmouth to be with his family.[5] Doc. 38, Ex. 1 at ¶ 9. Jack Nicholson's cousin,

Travis Fields ("Fields"), states Jack Nicholson lived with him and his fiancee in Alexandria,

Virginia, after Charles Nicholson was murdered. Doc. 38, Ex. 5 at ¶¶ 3, 4. Fields confirms

Nicholson was employed while living with him "for approximately two months during the Fall of

2000." Doc. 38, Ex. 5 at ¶ 4. The probation officer verified Nicholson was employed in the

Washington, D.C. area from November to December of 2000. Nicholson PSR at ¶¶ 41, 54.

Attempts by the probation officer to verify Nicholson's other employment experiences in the

Washington, D.C. area were unsuccessful. Nicholson PSR at ¶¶ 41, 55. Fields states Jack

Nicholson related his fears of being murdered like his step-father, and the death threats against

him. Doc. 38, Ex. 5 at ¶ 5.

　　　Rudolph testified against Butts in federal court, and Butts was convicted of "numerous

drug and weapons charges and will spend the rest of his life in prison." Doc. 38, Ex. 3 at ¶ 13;

---

[4] Rudolph indicates in his affidavit that "[a]fter [Charles Nicholson's] death, Jack was moving back and forth between [Sandra Nicholson's] house in Portsmouth and a cousin's house." Doc. 38, Ex. 3 at ¶ 10.

[5] Nicholson's affidavit asserts he returned to be with his mother for the Christmas holidays, and he stated at his sentencing hearing that he returned to be with his daughter. Doc. 38, Ex. 1 at ¶ 9; Doc. 29 at 30 (Nicholson Sentencing Hearing Transcript dated August 29, 2001). Nicholson's letter to AUSA James A. Metcalfe ("Metcalfe") incorporates both rationales for returning. Doc. 44, Ex. 11 at 2 (Nicholson letter to Metcalfe dated August 8, 2002).

Doc. 38, Ex. 4 at ¶ 8; Doc. 38, Ex. 23 (May 1, 2001 Article by The Virginian-Pilot). As of the date of his affidavit, over two years after he testified against Butts, Rudolph still did not feel it was safe for him to return to Portsmouth. Doc. 38, Ex. 3 at ¶ 14; Doc. 38, Ex. 4 at ¶ 8.

### B. Jack Nicholson Arrested and Retains Babineau

On January 7, 2001, Nicholson was arrested in Portsmouth for possession of a firearm by a convicted felon, and charged in state court. Doc. 38, Ex. 1 at ¶¶ 11-14. He was searched incident to a Terry frisk for furtive movements, and found to possess a 9mm semi-automatic firearm underneath his coat. Nicholson PSR at ¶ 8; Doc. 44, Ex. 3 (Typed Law Enforcement Notes concerning arrest of Jack Nicholson); Doc. 44, Ex. 4 (Notes of Officer K.L. Johnson, Jr. concerning arrest of Jack Nicholson). Nicholson was arrested while standing with Ronnie Roberts on the front porch of 48 Wilson Parkway in a Portsmouth Redevelopment and Housing Authority ("PRHA") Community. Nicholson PSR at ¶ 8; Doc. 44, Ex. 4. Nicholson asserts in his memorandum in support of his § 2255 Petition that he was legally required to be in Portsmouth despite the threat to his life, as "[h]e had to return to Portsmouth to meet with his probation officer." Doc. 38 at 19-20.

Nicholson's statements to law enforcement, after being arrested and read his Miranda rights, indicate Nicholson's stated need for protection. Doc. 44, Ex. 2 at 1-2 (Handwritten Law Enforcement Notes concerning Nicholson's statement to law enforcement); Doc. 44, Ex. 3 ("[Nicholson] made several statements in reference to having the handgun for protection."). Therein, the handwritten notes detail Nicholson stated he received the gun on the same day his [step-]father was murdered, and that he also believed he needed to protect himself because "there was a hit out on [him] because [he] supposedly had something to do with Lorenzo Butts' son

being murdered." Doc. 44, Ex. 2 at 1. Nicholson also stated "[t]hey say Vito Butts shot my brother Rudolph," "I didn't even know what Vito or Lorenzo looked like," and "I went yesterday and got the gun from the gun store [as it had been] repaired [and] bought some bullets." Doc. 44, Ex. 2 at 2. Finally, Nicholson remarked to one officer, "I still need it for protection, . . . my grandmother said a car was parked in front of her house because Rudolph goes there." Doc. 44, Ex. 2 at 2. Officer K.L. Johnson, Jr. notes Nicholson stated, "I was carrying the firearm for protection; my family has been having problems. You know all those shootings with the Butts." Doc. 44, Ex. 4 at 2.

Nicholson's mother retained Babineau to represent Nicholson in January of 2001. Doc. 38, Ex. 1 at ¶ 12; Doc. 38, Ex. 2 at ¶ 15.

Sandra Nicholson states she "told Mr. Babineau how my son Rudolph Nicholson had been shot, my ex-husband Charles Nicholson, had been murdered, and how there were death threats made against Jack." Doc. 38, Ex. 2 at ¶ 16. She claims she "told Mr. Babineau that Jack carried a weapon because he was scared for his life," and "showed Mr. Babineau newpaper clippings about the attempted murder of [her] son Rudolph and the murder of [her] ex-husband, Charles Nicholson." Doc. 38, Ex. 2 at ¶ 16. Babineau states in his affidavit that "Ms. Nicholson never, during any of the conversations she had with me, advised that the reason her son carried a gun was out of fear of Lorenzo Butts." Doc. 44, Ex. 1 at ¶ 7 (Babineau Affidavit dated August 20, 2003).

Nicholson asserts during his first meeting with Babineau, in January of 2001, he explained he possessed the weapon for his "personal protection" and was "afraid of Lorenzo Butts and his drug associates who had placed a contract on [his] life, had killed [his] step-father,

and tried to murder [his] brother." Doc. 38, Ex. 1 at ¶ 13.

Nicholson's state charges were dismissed "on or about January 30, 2001" and he was subsequently indicted in federal court for the same criminal conduct. Doc. 38, Ex. 1 at ¶¶ 14, 15.

Nicholson claims he explained to Babineau "why Lorenzo Butts had placed a contract on [his] life," that his "step-father's murder had prompted [him] to go into hiding in Northern Virginia," and that he "provided Babineau with the names and addresses of individuals in Northern Virginia who knew that [Nicholson] moved away from Portsmouth because [he feared] . . . being killed by Lorenzo Butts or his drug associates." Doc. 38, Ex. 1 at ¶¶ 18, 19.

In Babineau's affidavit, Babineau agrees he received the discovery responses regarding statements made by Nicholson to the police concerning Butts, but counters that Nicholson "advised [him] that he had nothing to do with Butts and was not afraid of him because he never dealt with him." Doc. 44, Ex. 1 at ¶¶ 9, 10. Babineau further contends, "During all my interviews with my client, Jack Nicholson, he never advised me that he was fearful of Lorenzo Butts on account of any action that Butts had taken against his family members," and never advised Babineau that any threat from or associated with Butts was the reason he carried the firearm. Doc. 44, Ex. 1 at ¶¶ 11, 13.

Babineau also asserts in his affdavit, that,

[Nicholson's] testimony relative to the issue of his possession of a firearm was not one out of fear of anyone in particular, including Butts, but that he carried a firearm because of the activity that he was involved in, which created dangerous situations and that he felt the need to have protection.

Doc. 44, Ex. 1 at ¶¶ 3, 12. Babineau states, "I advised him that he would have to testify in the case of the affirmative defense of self-protection/self-defense, which would subject him to cross-

examination on his extensive criminal record of violent crimes and drug offenses." Doc. 44, Ex.

1 at ¶ 3.


## II. POST-INDICTMENT HISTORY[6]

### A.  Press Coverage and Nicholson: Pretrial, Guilty Plea, Appeal to Fourth Circuit

#### 1. *Indictment and Pretrial*

On March 23, 2001, Nicholson was indicted for Felon in Possession of Firearm and

Ammunition, in violation of 18 U.S.C. 922(g)(1).  Doc. 1 (Indictment).  Defendant was arrested

on April 4, 2001.  Doc. 2 (Arrest Warrant).

On April 9, 2001, Babineau appeared on behalf of Nicholson at hearing before a United

States Magistrate Judge.  That same day, the Magistrate Judge entered an agreed Order, signed by

Babineau, respecting pretrial discovery matters.  Doc. 4 (Order of April 9, 2001).

Also, on April 9, 2001, The Virginian-Pilot published an article detailing Rudolph

Nicholson's role as a police informant; noting attempts on Rudolph Nicholson's life by Butts'

group; outlining Butts' criminal organization; and describing Butts' state court charges of

murder, kidnaping and gun offenses.  Doc. 38, Ex. 21.  Babineau would appear for Butts on his

state charges on May 23, 2001, just two weeks before Nicholson would enter his guilty plea.

Doc. 38, Ex. 9 (Babineau Cover Letter and Order of Substitution received by the Portsmouth

General District Court on May 23, 2001); Doc. 32 (Nicholson Plea Hearing Transcript dated June

6, 2001).

---

[6] This section does not necessarily represent the entire post-indictment history of the case, but only that which is necessary for consideration of the issue(s) currently before the Court.

Babineau confirms his representation of Nicholson in state and federal courts as detailed above. Doc. 44, Ex. 1 at ¶¶ 1-2.

On April 11, 2001, The Virginian-Pilot published another article, describing the United States' case against Butts and his associates. Doc. 38, Ex. 22. The article again mentioned Rudolph Nicholson and the attempts to kill Rudolph, noted that "Nicholson's father was gunned down," and alluded to "murder, kidnapping and gun charges in Portsmouth" against Butts. Doc. 38, Ex. 22.

On April 20, 2001, Babineau filed several pretrial discovery and evidentiary motions on behalf of Nicholson. Doc. 5 (Motion for Disclosure of Rule 404(b) Evidence); Doc. 6 (Motion for Leave to File Additional Motions, Memoranda, and Exhibits); Doc. 7 (Motion for Discovery and Inspection), 8 (Memorandum in Support of Motion for Discovery and Inspection); Doc. 9 (Motion for Exculpatory Evidence); Doc. 10 (Memorandum in Support of Motion for Exculpatory Evidence); Doc. 11 (Motion and Memorandum for Disclosure of Confidential Informants); Doc. 12 (Motion for Designation by Government of Intention to Use Evidence at Trial); Doc. 13 (Motion and Memorandum for Early Jencks Material); Doc. 14 (Motion for Search and Disclosure of Electronic or Other Surveillance); Doc. 15 (Points and Authorities in Support of Motion for Disclosure of Electronic Surveillance).

On May 1, 2001, an article published by The Virginian-Pilot described the convictions of Butts and his associates in federal court, again mentioned the state charges pending against Butts, and noted both the attempted killing of Rudolph Nicholson and the killing of Charles Nicholson. Doc. 38, Ex. 23.

## 2. *Guilty Plea*

On June 6, 2001, Nicholson pled guilty to the sole charge of the indictment. Doc. 32 (Transcript of Guilty Plea Hearing filed May 2, 2002). Nicholson was sworn and testified under oath. Doc. 32 at 3. At the outset of the hearing and several times thereafter, the Court advised Nicholson he faced "a mandatory minimum sentence of 15 years to life by entering a plea of guilty" to the charge. Doc. 32 at 2, 7. Nicholson indicated he was satisfied Babineau had "considered any defense" to the charge and with Babineau's representation as a whole. Id. at 8. The Court explained to Nicholson the impact of his plea of guilty stating, in part, "If you plead guilty and the court accepts your plea, the only thing remaining to be done in your case is the determination of your punishment, and that will be determined by the court." Id. at 6. Babineau addressed the Court concerning a suppression issue Babineau and Nicholson had discussed and chosen not to pursue, and Nicholson did not dispute Babineau's version of the decision. Id. at 10-11. Babineau indicated at hearing that he had communicated with his client via letters, and Nicholson did not dispute his description. Id. at 10. Babineau also detailed Nicholson's hospitalizations due to his medical concerns. Id. at 11-12. Defendant pled guilty and acknowledge he was in fact guilty. Id. at 12-13. In outlining the Government's case, Metcalfe stated, in relevant part, the following facts,

> Subsequently, he was taken down to the Portsmouth police headquarters. He was advised of his Miranda rights on the way. He stated that he had the firearm for his personal protection. He stated that he received the firearm in late 2000, and he certainly – the Court is probably familiar with other members of his family. It's certainly reasonable to believe that someone might try to injure or shoot him. He told the officers that he had taken the pistol to Chesapeake Gun Works to have it repaired because it was inoperable when he first got it, and that he went back and picked it up in early January.

Id. at 15.

On July 20, 2001, The Virginian-Pilot published an article about Butts' sentencing in federal court.[7] Doc. 38, Ex. 24. The article stated Butts was "sentenced to life in prison plus 105 years for crimes involving the distribution of multiple pounds of heroin and cocaine and ordering hits on anyone who crossed him." Doc. 38, Ex. 24. Again, it mentioned Butts' connection to several murders, and specifically noted the "failed hit early last year on 33-year-old Rudolph Nicholson of Portsmouth, a drug dealer turned police informant," and "Charles Nicholson, 51, Rudolph Nicholson's father, who was shot dead last September." Doc. 38, Ex. 24. Lastly, the article mentioned Butts' pending state charges in Portsmouth for the murder of Terrence Powell. Doc. 38, Ex. 24. Two further articles were printed regarding Butts' state charges concerning the Powell murder. Doc. 38, Ex. 26 (January 8, 2002 Article of The Virginian-Pilot); Doc. 38, Ex. 27 (December 16, 2002 Article of The Virginian-Pilot). As neither article was printed prior to Nicholson's sentencing hearing, neither bears upon Babineau's knowledge of his conflict or performance at the sentencing hearing. Accordingly, they are not considered.

### 3. *Sentencing Matters and Hearing*

The Nicholson PSR was prepared on July 23, 2001, and an addendum was prepared on August 22, 2001. Nicholson PSR at 1. The Nicholson PSR states, in relevant part,

> . . . after being [arrested and] advised of his Miranda Rights, Nicholson advised [officers of the Portsmouth Police Department] that he possessed the firearm in late September or early October 2000, on the day that his stepfather was murdered. He added that when he originally received the firearm the weapon did not work. Nicholson reported that he took the weapon to Chesapeake Gun Works to have the weapon repaired. He also stated that he retrieved the firearm from Chesapeake Gun Works on January 6, 2001. . . . The defendant added that although he had no association with the individual suspected of killing his stepfather, he feared that these individuals would also seek to harm him. . . . The defendant advised that he relocated to the Washington D.C. metropolitan area after

---

[7] As noted later, Babineau represented Butts for his sentencing hearing in federal court.

his stepfather was killed.  The defendant states that he fled the area because he feared for his life.

Nicholson PSR at ¶¶ 9, 16, 41.  The Nicholson PSR also shows an extensive criminal history, dating back to 1991, with convictions for Attempt to Kill, Use of a Firearm (x2), Possession with Intent to Distribute Cocaine, Unlawfully Shoot into an Occupied Vehicle, Forge Traffic Summons, Assault and Battery (x2), Assault, Possession of Marijuana by an Inmate, and Possession of Heroin, among others.  Nicholson PSR at ¶¶ 20-30.

On August 20, 2001, the United States filed its Position with Respect to Sentencing Factors, stating it did not dispute the facts and factors set forth in the Nicholson PSR.  Doc. 19. Nicholson, through Babineau, filed his Motion with Respect to Sentencing Factors on August 22, 2001.  Doc. 20.  Therein, Nicholson adopted the factual findings in the Nicholson PSR, and asserted his physical condition necessitated a downward departure from the sentencing guidelines.  Id. at 1.  Specifically, Nicholson argued he "suffers from a severe case of sickle cell anemia," and has been frequently and recently hospitalized as a result, which will cause "significant costs" to the Bureau of Prisons and create a "life threatening situation" for him.  Id. at 1-2.  On April 23, 2001, the Government responded to Nicholson's motion for a downward departure, arguing the guidelines encompassed the minimum mandatory sentence of fifteen (15) years, and disputing Defendant's factual assertions regarding the impact his sickle cell anemia should have on his sentence.  Doc. 21 (Response to Defendant's Motion for a Downward Departure).

Babineau maintains in his affidavit that prior to the sentencing hearing, he discussed Lorenzo Butts with Nicholson.  Doc. 44, Ex. 1 at ¶ 14.  Babineau states, "I again discussed with

Nicholson the fact that Lorenzo Butts had been alleged to have committed acts of violence, including murder and malicious wounding against his family members." Doc. 44, Ex. 1 at ¶ 14. According to Babineau, Nicholson stated he had no involvement with or information concerning Butts. Doc. 44, Ex. 1 at ¶ 14. Babineau states Nicholson never asserted to him "any link to his firearm possession and Lorenzo Butts or any other person." Doc. 44, Ex. 1 at ¶ 17. Babineau also notes in his experience "it is common for a drug dealer and/or person engaged in drug distribution activity advises that he possesses a firearm as a result of the business he is in, rarely requires more in depth questioning." Doc. 44, Ex. 1 at ¶ 18.

On August 29, 2001, the sentencing hearing was convened. At the outset of the hearing, Babineau noted that the spelling of the name of Nicholson's doctor was incorrect, as Nicholson had pointed out to Babineau during their discussions about the Nicholson PSR on prior occasions. Doc. 29 at 2 (Transcript of Sentencing Hearing on August 29, 2001). There, Nicholson acknowledged he received, considered, and discussed with Babineau the Nicholson PSR, and that he must be sentenced to at least one hundred and eighty (180) months' imprisonment. Doc. 29 at 2-3. Babineau asserted he extensively discussed the mandatory minimum sentence with Nicholson, and they agreed it applied. Id. at 3-4.[8] Nicholson did not dispute this. Id. at 4.

Nicholson was sworn and testified. Id. at 5-14. Babineau started his questioning by admonishing Nicholson to limit his answers to Babineau's questions, which would solely

---

[8] In its opinion of February 2, 2007, the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") also agreed that the statutory minimum sentence for Nicholson's offense is one hundred and eighty (180) months. Doc. 57 at 7 ("The statutory minimum sentence for Nicholson's offense, however, was 180 months, and the court sentenced him to 189 months.")

concern Nicholson's medical condition. Id. at 6. Babineau's examination of Nicholson concerned only Nicholson's medical condition. Id. at 5-13.

Metcalfe again noted, "Quite frankly, when he was arrested, there were people out to kill him." Id. at 16. Metcalfe also stated Nicholson "has lost family members," and that the lengthy sentence would give Nicholson the "opportunity to live longer by this sentence . . . and get away from this violent past that has been his life apparently." Id. at 16-17. Before the Court pronounced sentence, Nicholson made an unsworn statement, detailing his reasons for carrying the gun. Id. at 23-25. Babineau indicated he discussed with Nicholson whether he should make a statement. Id. at 23. Nicholson asserted,

> Then I was the victim of circumstance, as Mr. Metcalfe said. I was – someone was out to kill me just because of my brother involvement with the police. He was an informant. My brother was shot eight times. They tried to kill him. He survived. That was early last year. And then the end of September, my father was murdered because of my brother also. So from that point on, I mean I was in fear for my life, so, yes, I possessed a gun, but it was only for my protection . . . that was just because of my protection. . . . now I mean I don't have to worry about the people I thought was out to kill me anymore, because they have been sentenced in one of these same courtrooms. He received life and 105 years, so I guess I don't have to worry about that anymore. But I only possessed that firearm just for my protection and the protection of my family. . . . I even left the area for a while to try to get away from everything that was going on, but I came back because I have a daughter now . . .

Id. at 23-25. At hearing, the Court sentenced Nicholson to one hundred and eighty-nine (189) months' imprisonment, followed by five (5) years' supervised release, and a special assessment of $100.00, in addition to other measures. Doc. 22 (Judgment in a Criminal Case filed August 31, 2001). In addition to completing the Judgment in a Criminal Case, the Court also contemporaneously completed a Statement of Reasons detailing its rationale for its sentencing decision. Doc. 38, Ex. 17 (Exhibit to Defendant's Memorandum in Support of § 2255 Petition

filed June 6, 2003). Though not authorized for public disclosure, Defendant included a copy of

the Statement of Reasons as an attachment to his Memorandum in support of his § 2255 Petition.

Doc. 38, Ex. 17. In the Statement of Reasons, the Court stated its basis for its sentencing

decision noting that "Defendant possessed weapon as his life was threatened." Doc. 38, Ex. 17.

The Court has since filed the original Statement of Reasons, as the Defendant filed it in the

Court's public file while not placing it under seal. Doc. 96; See Doc. 38, Ex. 17. The Court

notes that Defendant's attorney stated to the Court at hearing that he had never seen the

Statement of Reasons before the hearing. However, his statement was obviously false as an

attorney from Defendant's firm filed a copy of the Statement of Reasons on June 6, 2003 with the

Court. Doc. 38, Ex. 17.

### 4. *Appeal*

Nicholson filed his notice of appeal on September 5, 2001, requesting Babineau be

appointed to represent him on his appeal. Doc. 23 (Letter from Nicholson Dated August 30,

2001). Babineau was appointed as counsel for Nicholson for the appeal. Doc. 26 (Order Dated

nunc pro tunc September 5, 2001). Babineau "filed a brief pursuant to Anders v. California, 386

U.S. 738 (1967), challenging the district court's refusal to grant a downward departure in light of

Nicholson's physical condition pursuant to U.S. Sentencing Guidelines Manual § 5H1.4 (2000)."

Doc. 33 at 2 (Opinion of Fourth Circuit Dated June 10, 2002). The Fourth Circuit affirmed the

Court's ruling regarding Nicholson's motion for a downward departure due to his medical

condition. Doc. 33. Interestingly, the Fourth Circuit also concluded, "[t]o the extent Nicholson

asserts that he was carrying the firearm in question in self-defense, we find that fact impacts upon

neither his conviction nor his sentence." Doc. 33 at 2. The Fourth Circuit did not address any

claims concerning Babineau's representation of Nicholson in its Opinion. Id. As Babineau filed
an Anders brief, the Fourth Circuit noted it informed Nicholson "of his right to file a
supplemental pro se brief and granted an extension of time to do so," but concluded Nicholson
did not file such a brief. Id. at 2. In a letter drafted to the Clerk of the Fourth Circuit Court of
Appeals, and copied to this Court and received in chambers on January 23, 2002, Nicholson
requested an extension to file a supplemental pro se brief. Therein, Nicholson complains of
Babineau's handling of his appeal, and argues Babineau should have presented his self defense
argument at hearing.[9]

### 5. *Nicholson's Attempt to Substantially Assist the Government*

Babineau states that he contacted Metcalfe and set up a meeting between Nicholson and
Government agents for Nicholson to assist them. Doc. 44, Ex. 1 at ¶ 15. The purpose of this
meeting for Nicholson was to give information in the hope of later obtaining a Federal Rule of
Criminal Procedure 35(b) ("Rule 35(b)") reduction in his sentence for substantial assistance to
the government. Doc. 44, Ex. 1 at ¶¶ 15, 16. The meeting was conducted on September 4, 2001.
Doc. 44, Ex. 10 (Letter of ATF Task Force Agent M. Darrell Logwood to Metcalfe dated
December 10, 2002). Because Nicholson was unable to provide the Government with substantial
assistance, no Rule 35(b) motion was made by the United States. Doc. 44, Ex. 1 at ¶ 16; Doc.
44, Ex. 10 (stating "[t]he information provided by NICHOLSON did not provide substantial
assistance to the government.").

---

[9] As mentioned, it appears the Fourth Circuit considered this argument, however, as the
opinion notes, "[t]o the extent Nicholson asserts that he was merely carrying the firearm in
question in self-defense, we find that fact impacts upon neither his conviction nor his sentence."
Doc. 33 at 2.

On August 8, 2002, Nicholson wrote Metcalfe concerning a Rule 35(b) motion, again stating his reasons for carrying the firearm, and detailing his family history with Butts and his associates. Doc. 44, Ex. 11 (Nicholson letter to Metcalfe dated August 8, 2002). On December 3, 2002, Sandra Nicholson wrote Metcalfe inquiring about a Rule 35(b) motion for her son, Jack Nicholson. Doc. 44, Ex. 12 (Sandra Nicholson letter to Metcalfe dated December 3, 2002). On December 10, 2002, Metcalfe wrote Sandra Nicholson detailing his reasons for not making a Rule 35(b) motion for Nicholson. Doc. 44, Ex. 13 (Metcalfe letter to Sandra Nicholson dated December 10, 2002).

### 6. *Babineau Withdraws from Representation of Nicholson*

After rendering its Opinion concerning Defendant's appeal, the Fourth Circuit granted Babineau's motion to withdraw as counsel. Doc. 36 (Fourth Circuit Order filed August 14, 2002).

### B. Nicholson: § 2255 Petition, Appeal, Remand Proceedings

### 1. *§ 2255 Petition, Initial Pleadings and Ruling*

On June 6, 2003, Nicholson filed a Motion under § 2255, and Memorandum in Support. Docs. 37 (Motion), 38 (Memorandum). Therein, Nicholson asserts, through his new Attorney Terri J. Harris,[10] that he was denied effective assistance of counsel at the pretrial investigative, plea and sentencing stages of his case, by virtue of Babineau's actual conflict in also representing Lorenzo Butts. Doc. 38. Specifically, Nicholson claims he possessed a firearm to protect himself from Butts and his associates, who had threatened to kill him, attempted to kill his brother, and murdered his step-father. Doc. 38 at 12. In Nicholson's attached affidavit, he states

---

[10] Nicholson is also currently represented by Marvin David Miller, of the same law firm.

that when he was arrested he "told the police that the only reason [he] had the weapon was to protect [him]self from the contract Lorenzo Butts had placed for [his] murder." Doc. 38, Ex. 1 at 1. Nicholson does not independently state under oath whether he had any other reasons for possessing the firearm. Doc. 38, Ex. 1.

On September 4, 2003, The United States filed its Response to Nicholson's § 2255 Motion. Doc. 44 (Response of the United States to Petitioner's Motion to Vacate, Set Aside or Correct Sentence). As noted, Babineau's affidavit was attached to the Government's Response filing. Doc. 44, Ex. 1. Therein, Babineau stated he discussed the self defense theory with Nicholson and Nicholson "advised [Babineau] that [Nicholson] had nothing to do with Butts and was not afraid of him because he never dealt with him." Doc. 44, Ex. 1 at 3-4. Rather, Nicholson advised Babineau that he possessed the firearm "because of the activity that he was involved in, which created dangerous situations and that he felt the need to have protection." Doc. 44, Ex. 1 at 4. Additionally, the Government included a faxed letter from Metcalfe to ATF Agent J.D. Underwood concerning Nicholson's decision not to plead guilty on a certain day. Doc. 44, Ex. 7. Thereafter, Agent Underwood was copied to a letter confirming a later date for Defendant to enter a plea of guilty. Doc. 44, Ex. 9.

Nicholson filed his Reply on September 17, 2003. Doc. 46 (Defendant's Reply to the Response of the United States).

On October 15, 2003, the Court denied Defendant's § 2255 Motion, ruling, in part, that Babineau did not have an "actual conflict" in representing both Butts and Nicholson. Doc. 51 at 9-10 (Order dated October 15, 2003).

## 2. *Appeal and Remand*

Nicholson appealed the Court's decision. Doc. 52 (Notice of Appeal filed December 4,

2003). Defendant's Motion for Certificate of Appealability lists several grounds for appeal.

Doc. 53 (Petitioner's Motion for a Certificate of Appealability filed December 4, 2003).

However, the Fourth Circuit only granted review on the limited issue of "whether Nicholson's

lawyer had an actual conflict of interest during Nicholson's sentencing proceedings and . . .

whether his sentence should be vacated due to the denial of his Sixth Amendment right to

effective assistance of counsel." Doc. 57 at 2 (Opinion of the Fourth Circuit decided February 2,

2007).

The Fourth Circuit ruled on February 2, 2007 that Babineau had an actual conflict in

representing both Butts and Nicholson, and remanded the case. Doc. 57. The Fourth Circuit

"remand[ed] for a determination on whether Babineau's conflict adversely impacted his

performance in Nicholson's sentencing proceedings." Id. at 16. The mandate of the Fourth

Circuit was filed with this Court on March 28, 2007, and the complete record has been received.

Doc. 58 (Judgment).

## 3. *Discovery and Pre-hearing Events*

On April 11, 2007, Nicholson filed several motions regarding discovery concerning the

pending § 2255 motion. Doc. 59 (Request for Release of Pre-Sentence Investigation Report of

Lorenzo Butts); Doc. 60 (Motion for Rule 17(c) Subpoena concerning the records of Babineau);

Doc. 61 (Request for the Issuance of Writ of Habeas Corpus ad Testificandum to allow the

testimony of Nicholson at the evidentiary hearing). On May 9, 2007, the Court ordered the

United States to produce a redacted copy of the Butts PSR to Nicholson as agreed by the parties.

Doc. 62 (Order entered May 9, 2007).

On May 21, 2007, the Court convened a telephonic hearing with the attorneys for Defendant and the United States to consider several discovery and logistical concerns regarding the pending § 2255 petition. Docket 2:01cr41; Doc. 79 (Transcript of May 21, 2007 Telephonic Conference filed October 17, 2007). The Court ruled on certain issues and the parties reached agreement on others, and the Court confirmed the agreements and its rulings by Order on May 23, 2007. Doc. 79; Doc. 65.

On July 16, 2007, after receiving the arguments of counsel during a telephonic conference and through their pleadings, the Court ordered the United States to produce certain requested records maintained by Babineau regarding his representation of Butts. Doc. 71 (Order entered July 16, 2007); Doc. 66 (Memorandum in support of Motion filed by Nicholson on May 31, 2007); Doc. 67 (Brief in Response to Nicholson's Motion filed by United States on June 22, 2007); Doc. 69 (Reply Memorandum in support of Nicholson's Motion filed on June 29, 2007).

On September 19, 2007, the Court ruled in response to the letters of counsel and also reiterated its findings concerning several logistical and discovery issues in this case. Doc. 77 (Order entered September 19, 2007). On the same day, the Court entered an agreed Order to Extend the Discovery Period to September 5, 2007. Doc. 78.

On January 18, 2008, Defendant filed a copy of the May 21, 2007 telephonic conference transcript, transcripts of videotaped depositions of Babineau and Nicholson, as well as copies of certain medical records of Defendant. Doc. 88 (Transcript of May 21, 2007 Telephonic Conference); Doc. 85 (Transcript of September 4, 2007 Deposition of Nicholson); Doc. 84 (Transcript of August 9, 2007 Deposition of Babineau); Doc. 89 (Medical Records of

Nicholson); Doc. 87 (Duplicate copy of Transcript of September 4, 2007 Deposition of

Nicholson); Doc. 86 (Duplicate copy of Transcript of August 9, 2007 Deposition of Babineau).

On January 29, 2008, Defendant filed a Bench Memorandum setting forth its argument in

support of its § 2255 Petition. Doc. 81. Defendant included as attachments to its Bench

Memorandum the following documents:

1.  A timeline of events;
2.  A copy of an ATF Report of Investigation dated January 8, 2001 concerning the underlying offense;
3.  A copy of handwritten notes from Officer K.L. Johnson Jr. concerning the underlying offense;
4.  A copy of an evidence voucher in Defendant's case;
5.  A copy of handwritten notes concerning the underlying offense;
6.  A copy of a declaration and Chesapeake Correctional Center records showing only one recorded visit by Babineau to Nicholson from April through September of 2001;
7.  A copy of a notice of appearance by Babineau to represent Butts in Portsmouth Circuit Court;
8.  A copy of letter from Nicholson to Babineau dated July 9, 2001 concerning a desire to forward a suppression argument, after Defendant had already pled guilty;
9.  A copy of a letter from Nicholson to Babineau which is undated and which references a sentencing argument of self defense while also noting that an appeal has been filed.

Doc. 81, Exs. 1-9. On January 29, 2008, the Government filed a Supplemental Brief regarding

Issues on Remand and in any Re-sentencing. Doc. 82. The Government filed several exhibits in

support of its Supplemental Brief, including:

A.  ATF summary of January 7, 2001 arrest of Defendant by ATF Agent Underwood;
B.  Handwritten notes of January 7, 2001 interview of Defendant by ATF Agent Underwood;
C.  Handwritten notes of April 12, 2001 interview of Defendant by ATF Agent Underwood;
D.  Draft Affidavit of April 12, 2001 interview by ATF Agent Underwood;
E.  Affidavit of August 20, 2003 by Babineau;
F.  Summary of interview of Defendant on September 4, 2001 by ATF Agent Logwood;

G.    Letter dated December 11, 2001 from Babineau to Defendant;
H.    Letter dated December 12, 2001 from Fourth Circuit to Defendant;
I.    Letter dated January 5, 2002 from Babineau to Defendant.

Doc. 82, Exs. A-I. Government's exhibits A, B, C, E (as Defendant's #2), F, G, H, and I were received at hearing on January 30, 2008.

At the April 12, 2001 interview, Defendant disclosed to ATF Agent Underwood his extensive history as a drug dealer which began in 1990 as a crack cocaine dealer, his possession of illegal drugs while incarcerated, the beginning of his heroin dealing ventures in 1999, his attempt to find Butts and revenge Charles Nicholson's murder, and his departure from Portsmouth to Maryland in September of 2000. Doc. 82, Ex. C. Defendant further told ATF Agent Underwood that he returned to Portsmouth after learning from his grandmother that Lorenzo Butts had been incarcerated. Doc. 82, Ex. C. Nicholson signed each page of the interview notes of ATF Agent Underwood. Doc. 82, Ex. C.

The notes from Defendant's September 4, 2001 interview reveal the following information. Doc. 82, Ex. F. Defendant began selling drugs by dealing crack cocaine at fifteen (15) or sixteen (16) years old, and has been involved in dealing drugs and committing violent crimes ever since. Doc. 82, Ex. F. Specifically, Defendant stated:

> [He] sold heroin from December of 2000 until he was arrested in April of 2001. Sold five hundred caps weekly [and] (sic) would purchase eight balls. Nicholson sold heroin until arrested on gun charge.

Doc. 82, Ex. F.

On January 29, 2008, Defendant filed a letter requesting that certain documents be filed. These documents have been filed as follows:

1.    Judgment and Commitment Order of Butts (Doc. 90);

2.      Butts PSR (under Seal) (Doc. 91);
3.      The Declaration and attachment of Deputy Sheriff John Aten (Doc. 92);
4.      Judgment and Commitment Order of Jack Tuttle Kellam ("Kellam") (Doc. 93);
5.      Defense Position on Sentencing in Kellam (Doc. 94); and
6.      Joint Appendix in Nicholson (Doc. 95).

On January 30, 2008, Defendant filed its Reply Memorandum to Prosecution's

Supplemental Brief. Doc. 83.

### 4. *Babineau and Nicholson Depositions*

As noted, Babineau was deposed on August 9, 2007 and Nicholson was present at the

deposition via "video hook-up." Doc. 86 at 1, 4. Babineau was sworn and testified. Doc. 86 at

4. Babineau described his employment transition during 2001 and the loss of parts of the

Nicholson file, including his notes, as a result. Doc. 86 at 13-15, 24-28, 30, 32-33, 36-37, 67-69,

110, 113-15, 155-56. Babineau testified that Nicholson communicated with Babineau

concerning Nicholson's reason for possessing the firearm on the date he was arrested. Doc. 86 at

43. Nicholson told Babineau "that he was a drug dealer . . . and that he had a number of gun

crimes and drug crimes that he had been not only charged with, but convicted of in the past."

Doc. 86 at 43. Babineau acknowledged that Nicholson told police that he was concerned about

Butts as a reason for possessing the weapon. Doc. 86 at 44-45. Babineau detailed his reasons for

not forwarding a defense of self defense on behalf of Nicholson stating,

> When he took the stand and testified, it was going to open him up to cross-examination,
> not only his criminal record but other statements that would be attributed to him, also.
> Secondly, and very importantly, is that I was not going to suborn perjury for Jack
> Nicholson. Jack Nicholson had told me that he was not afraid of Butts. That's
> contradictory to other statements that he made to law enforcement and otherwise, but he
> wasn't afraid of Butts. He didn't even know what Vito Butts and Lorenzo Butts looked
> like, and I think he even told investigators that at one point in time during the debrief, and
> that he was not going to testify. Not only was he not going to testify, but he carried a gun
> because he was a drug dealer and he used the gun for protection. Was it protection from

> Butts and his folks? I'm sure it was. But it was also protection from the many other people that he dealt drugs to and dealt drugs with on the streets of Portsmouth. And if you looked at his criminal record, as I did, with all of the violence that he had in there, including gun violence and drugs, it was clear to me that that all made sense. He was telling me he carried a gun because of the trade, the practice he was in.

Doc. 86 at 64-65. Babineau countered that the information concerning Nicholson's alleged reason for carrying the firearm and supporting evidence were before the Court in the Nicholson PSR and noted that the Court indicated "in [its] own handwriting, that he found within the guidelines because he believed that he – part of the reason he possessed the gun was because he was in fear or was a self-protection issues." Doc. 86 at 109. Babineau again reiterated:

> Secondly, what I knew about my conversations with Jack Nicholson, which maybe he admits, maybe he denies, is that he carried a gun before this – any of this came to light, and told me that part of the reason he carried a gun, big part of the reason he carried a gun is because he was a drug dealer.

Doc. 86 at 109. When pressed on why Babineau failed to provide additional information concerning Nicholson's alleged fear of Butts, Babineau responded:

> Jack told me repeatedly that he was not afraid of Lorenzo Butts. I think even at one point in time he said he went out and drove in the car with the gun to try – trying to find Butts and kill him himself. That's not the sign of a man that's afraid.

Doc. 86 at 113. Upon questioning from the Government, Babineau again stated his reasons for not forwarding a self defense theory at Nicholson's sentencing hearing and for not filing a motion for downward departure under this theory. Doc. 86 at 127-132. Moreover, Babineau addressed an interview conducted by federal agents of Nicholson on April 12, 2001. Doc. 86 at 133. Babineau was contacted regarding the outcome of the interview. Doc. 86 at 133-34. Babineau further detailed his hope for Nicholson was to cooperate with the government, and ultimately reduce his sentence by benefitting from a motion by the Government under Rule 35(b). Doc. 86

at 135-42, 151-53 (". . . if [Nicholson] got a Rule 35B or a 5K-1 . . . then that was the only circumstance under which his sentence could fall below 180 months.").

As mentioned, on September 4, 2007, nearly one month after witnessing Babineau's deposition, Nicholson was deposed. Doc. 87 at 1. Nicholson testified concerning the background connection between Butts and his family. Doc. 87 at 5-14. Nicholson stated how he received a gun and his subsequent move to Northern Virginia. Doc. 87 at 14-17. Nicholson reiterated his comments to the police "that [he] needed [the gun] for [his] protection" from Lorenzo Butts. Doc. 87 at 24, 26. Nicholson states he was released from jail on January 30, 2001 after his state firearm charge was dismissed, did not possess or attempt to possess another gun, and proceeded to stay at his mother's house until he was arrested on the federal firearm charge on April 4, 2001. Doc. 87 at 32-34. Nicholson admits to being interviewed by a federal agent on April 12, 2001. Doc. 87 at 40-41. Nicholson spoke of a letters he wrote to Babineau concerning his desire to forward a suppression argument, which were dated after he had pled guilty. Doc. 87 at 50-54. Nicholson testified to another person's "sole reason" for giving him the firearm, but did not state that his sole reason for possessing the firearm was out of fear for Butts. Doc. 87 at 66. Nicholson admitted to telling federal agents "what [he] knew" in a debriefing after he pled guilty. Doc. 87 at 68. Nicholson agreed that he told the agents he thought about seeking revenge for Charles Nicholson's murder, but asserts "I thought about it, but I couldn't do it." Doc. 87 at 70-71, 101. The Government questioned Defendant concerning whether Defendant was "dealing drugs, including heroin," when he returned to Portsmouth before being arrested. Doc. 87 at 86-90, 99-101. Defendant's attorney objected on relevance and Fifth Amendment grounds and Defendant did not respond to the questions. Doc. 87 at 86-90, 99-

101. Nicholson denied that Babineau asked him questions concerning Nicholson's criminal background and drug dealing activities. Doc. 87 at 90-91. Nicholson acknowledged stating in a letter to Babineau that he didn't "have a chance with the trial." Doc. 87 at 93. Defendant admitted to requesting the Fourth Circuit to appoint Babineau to prosecute his appeal. Doc. 87 at 103. At no point during Nicholson's testimony did he specifically deny possessing the firearm in part because he was a drug dealer. Doc. 87. Additionally, Nicholson never specifically denied having told Babineau, Agent Underwood, or Agent Logwood that he was dealing drugs during the time period when he was arrested. Doc. 87. Further, Nicholson did not deny telling Babineau that a reason for his possession of the firearm was to further his drug dealing business. Doc. 87.

### 5.  *January 30, 2008 Hearing*

On January 30, 2008, the Court convened a hearing to consider additional evidence and argument submitted by the parties. Nicholson was present via a video hook-up from the Bureau of Prisons facility, observed the entire proceedings, and was available to speak privately with his attorney at his request. Babineau was excluded from the court room over the Government's objection, along with the other witnesses, and the parties gave their opening remarks. The Defendant again directed the Court's attention to certain items of evidence which Defendant had previously filed or forwarded to the Court for the Court's consideration. Defendant did not testify or call any witnesses.

The Government called ATF Agent Underwood, who was sworn and testified. The Court found Agent Underwood's testimony credible and believable. Agent Underwood testified to his involvement in Nicholson's case from the beginning, starting with his initial interview of

Nicholson on the date of the offense.  Initially, on the offense date, Nicholson told Agent Underwood that he possessed the firearm for protection.  Agent Underwood also conducted an interview of Nicholson on April 12, 2001.  On April 12, 2001, Nicholson told Underwood of his extensive history as a drug dealer which began in 1990 and extended until his arrest on January 7, 2001.  In fact, even while Nicholson was incarcerated for some of his criminal conduct, he continued to possess and distribute heroin while in jail.

The Government next called ATF Agent Logwood, who was sworn and testified.  The Court found Agent Logwood's testimony credible and believable.  Agent Logwood interviewed Nicholson on September 4, 2001.  Agent Logwood testified that Nicholson told him that he sold heroin from December of 2000 until he was arrested in April of 2001.  Nicholson sold five hundred (500) capsules weekly and would purchase eight balls.  He estimated the capsules would sell for twenty dollars ($20.00) per capsule.  An eight ball is a street narcotics term for one-eighth of an ounce, meaning that Nicholson purchased heroin in one-eighth of an ounce quantities.  The purpose of the interview was to allow Defendant to substantially assist the Government and possibly benefit himself through a Rule 35(b) motion.

The Government's final witness was Babineau, who was sworn and testified.  The Court found Babineau's testimony credible and accepts the facts to which he testified.  After Nicholson's April 12, 2001 interview with Agent Underwood, Nicholson told Babineau what he told the agent at that interview.  Nicholson specifically told Babineau that he admitted during the interview with the agent that when he returned to Tidewater he resumed selling heroin in Portsmouth.  Babineau believed that the Government attorney prosecuting Nicholson knew of the content of Nicholson's April 12, 2001 interview.  Babineau discussed Nicholson's criminal

history with him, including his violent history with firearms. Nicholson told Babineau that he was not afraid of Butts. Babineau discussed a self defense argument with Nicholson prior to Nicholson's guilty plea. Babineau and Nicholson agreed that for several reasons they should not present the self defense argument. First, Nicholson would be subject to cross-examination on his drug dealing past and violent history of using firearms. Second, Nicholson had previously told Babineau that he was not afraid of Butts, and he had also told Babineau that he possessed the firearm because he was a heroin dealer.

Similarly, Babineau did not raise Nicholson's reason for possessing the firearm on the date of the offense at the sentencing hearing for several reasons. First, Nicholson's previous self defense statements to law enforcement were already before the Court by virtue of the comments of the Government at Nicholson's guilty plea hearing and also in the Nicholson PSR. Second, Nicholson's statements to Babineau directly conflicted with evidence already in the record, including that he was not afraid of Butts and he carried a firearm because he dealt drugs. Nicholson's statement was consistent with his PSR which contained a serious criminal history of violence and firearms offenses which occurred while Nicholson was dealing drugs.

During Babineau's representation of Nicholson, he communicated with Nicholson by meeting Nicholson in jail and at the hospital, and via telephone and letters. Babineau explained his absence of notes was a result of misplacing Nicholson's file when he changed law firms and the Court concludes the credibility of Babineau's testimony is not compromised by his lapse of judgment in simultaneously representing Butts and Nicholson. At hearing, the Court received additional copies of documents previously provided to and considered by the Court.

### III. BABINEAU'S REPRESENTATION OF BUTTS IN FEDERAL AND STATE COURTS

On November 20, 2000, a Complaint was filed charging Butts with a single count of Possession of five hundred (500) grams or more of Cocaine with the Intent to Distribute, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B). Butts Doc. 1 (Docket No. 2:00cr67-1) (Complaint). According to the Butts PSR, Butts was in custody throughout his federal proceedings, beginning with his detention on November 20, 2000. Butts PSR at 1. Additionally, also on November 20, 2000, a superseding indictment was filed, charging Butts and four other defendants. Butts Doc. 3 (Indictment).

Butts was charged with a number of drug distribution and firearms offenses. Butts Doc. 8 (Second Superceding Indictment filed December 12, 2000). At Butt's detention hearing on November 24, 2000, Butts appeared through Attorney Thomas B. Shuttleworth ("Shuttleworth"), who continued to represent Butts at his trial. see Docket No. 2:00cr67-1. On April 30, 2001, a jury found Butts guilty of all but two counts charged in the indictment. Butts Doc. 57 (Verdict Form filed in Open Court April 30, 2001).

On June 25, 2001, Babineau was substituted as Butts' counsel, and Shuttleworth was relieved. Butts Doc. 63 (Order filed June 25, 2001). Babineau represented Butts following his trial and throughout his sentencing and appeal. He was made aware of Butts' history with Nicholson and Nicholson's family.

The Butts PSR mentions Jack Nicholson and his family members by name. It states, "Lorenzo Butts made an oral 'hit list' of people he intended to have killed. The list included

Tony Vass and his brothers, KC Nicholson,[11] Rudolph Nicholson and Jake Nicholson.[12]" Butts PSR at ¶ 46. Also, Lorenzo Butts admitted to killing KC Nicholson. Id. at ¶ 49.

The sentencing hearing was convened on July 19, 2001, and Butts was sentenced to a term of life plus one thousand two hundred and sixty (Life + 1,260) months' imprisonment, to be followed by five (5) years' supervised release, and a $1,500.00 fine. Butts Doc. 68 (Judgment in a Criminal Case). As of the date of the sentencing hearing, Babineau represented Butts on state charges in Portsmouth, concerning the murder of Terrence Powell, which were eventually <u>nolle prosequied</u> on motion of the Commonwealth on January 7, 2002. Doc. 44, Ex. 1 at 6.

## IV. APPLICABLE LEGAL PRINCIPLES

The Fourth Circuit held "Nicholson's lawyer had an actual conflict of interest when Nicholson was sentenced, and we reverse and remand for a determination of whether that conflict adversely impacted the performance of his lawyer in Nicholson's sentencing proceedings." Doc. 57 at 2. The Fourth Circuit otherwise described the Court's obligation on remand to determine "whether it would have been objectively reasonable for Babineau to seek a downward sentencing departure based on necessity and self-defense." Doc. 57 at 8. Thus, the issue before the Court is strictly factual, and does not require the resolution of any significant legal issues. However, this section addresses the legal principles which bear on the Court's factual determinations.

---

[11] Charles Nicholson's obituary indicates he went by the name "Casey" Nicholson, as well as Charles Nicholson. Doc. 38, Ex. 25.

[12] This presumably concerns "Jack" Nicholson, as "Jake" is not mentioned anywhere else in the Court filings regarding Jack Nicholson or in the Butts PSR.

## A. § 2255 Motion and Hearing

A custodial prisoner may collaterally attack his sentence under § 2255, by asserting "the sentence was imposed in violation of the Constitution or laws of the United States." 28 U.S.C. § 2255. Pursuant to § 2255, if the Court rules in favor of Nicholson, it "shall vacate and set the judgment aside and shall . . . resentence [Nicholson] . . . or correct the sentence as may appear appropriate." 28 U.S.C. § 2255. In addition to oral testimony, the Court may accept evidence by deposition or affidavit. 28 U.S.C. § 2246. "If affidavits are admitted any party shall have the right to propound written interrogatories to the affiants, or to file answering affidavits." Id.[13] Additionally, transcripts of previous court proceedings shall be admissible into evidence. 28 U.S.C. § 2247. In a § 2255 claim, the petitioner bears the burden of proof, and must establish his claim(s) by a preponderance of the evidence. Miller v. United States, 261 F.2d 546, 547 (4th Cir. 1958) (per curiam) (citations omitted).

## B. Constitutionally Ineffective Assistance of Counsel

The Sixth Amendment to the United States Constitution provides, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defence." U.S. CONST. amend. VI. "[T]he purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation, [but] . . . is simply to ensure that criminal defendants receive a fair trial." Strickland v. Washington, 466 U.S. 668, 689 (1984). "Counsel's function is to assist the defendant, and hence counsel owes the client a

---

[13] Presently several affidavits are unsigned, not dated and/or not notarized, as indicated. Specifically, Rudolph Nicholson's affidavit is neither signed nor dated, and Jack Nicholson's affidavit is not notarized. Despite this, the Court considers these affidavits as evidence in favor of Defendant.

duty of loyalty, a duty to avoid conflicts of interest." Strickland, 466 U.S. at 688.

## 1. *Strickland* and *Cuyler*

The decision of the United States Supreme Court in Strickland, 466 U.S. 668, provides the starting point in analyzing a claim of ineffective assistance of counsel. In Strickland, the Court concluded "[a] convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or [] sentence has two components." Strickland, 466 U.S. at 687. First, the defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. Second, the defendant must prove counsel's "deficient performance prejudiced the defendant." Id. "In certain Sixth Amendment contexts, prejudice is presumed." Strickland, 466 U.S. at 692. For example, "prejudice is presumed when counsel is burdened by an actual conflict of interest." Strickland, 466 U.S. at 692 (citing Cuyler v. Sullivan, 446 U.S. 335, 345-50 (1980)). In these cases, "[p]rejudice is presumed only if the defendant demonstrates that counsel 'actively represented conflicting interests,' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" Strickland, 466 U.S. at 692 (citing Cuyler, 446 U.S. at 350, 348). Presently, the Fourth Circuit found Babineau had an actual conflict of interest in representing both Butts and Nicholson. Doc. 57 at 2. Therefore, the Court's only consideration is whether this actual conflict adversely affected Babineau's performance at Nicholson's sentencing hearing. Doc. 57 at 2, 8. If the Court finds the conflict "adversely affect[ed] counsel's performance in the defense of the defendant, prejudice to the defense is presumed and a new [sentencing hearing] must be ordered." United States v. Tatum, 943 F.2d 370, 375 (4th Cir. 1991) (citing Cuyler, 446 U.S. at 348-50).

Notably, the Government argues that the Court's finding that "Defendant possessed weapon as his life was threatened" in its Statement of Reasons demonstrates Defendant suffered no prejudice, regardless of whether the actual conflict adversely affected Babineau's actions at the sentencing hearing. Doc. 82 at 10, 24; Doc. 38, Ex. 17. According to the Government this language demonstrates that the Court accepted and acted upon the self defense theory. However, the Court cannot speculate on what action it would have taken if additional evidence or argument had been presented on Defendant's self defense theory, nor can the Court speculate on what action it would have taken if additional evidence had been presented showing Defendant was dealing drugs during the time period from his return to Portsmouth until his arrest. Moreover, the Fourth Circuit's opinion in <u>Tatum</u> does not indicate that the presumption of prejudice may be rebutted. Therefore, the Court does not reach this argument.

### 2. *Adverse Effect*

Adverse effect may be revealed either "from a review of the affirmative actions taken" or upon consideration of counsel's "failure to take actions that are clearly suggested from the circumstances." <u>Tatum</u>, 943 F.2d at 376. Counsel's failures to act may include his actions both in court and in preparation for court. <u>Tatum</u>, 943 F.2d at 376. As stated in <u>Strickland</u>, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." <u>Strickland</u>, 466 U.S. at 691.

To prevail in establishing an adverse effect, Nicholson must establish, by a preponderance of the evidence, three findings. <u>Mickens v. Taylor</u>, 240 F.3d 348, 361 (2001). First, Nicholson "must identify a plausible alternative defense strategy or tactic that his defense counsel might have pursued." <u>Mickens</u>, 240 F.3d at 361. Second, Nicholson "must show that the alternative

strategy or tactic was objectively reasonable under the facts of the case known to the attorney at the time of the attorney's tactical decision." Mickens, 240 F.3d at 361. In other words, Nicholson "must show that the alternative strategy or tactic was 'clearly suggested by the circumstances.'" Mickens, 240 F.3d at 361 (quoting Tatum, 943 F.3d at 376). Third, Nicholson "must establish that the defense counsel's failure to pursue that strategy or tactic was linked to the actual conflict." Mickens, 240 F.3d at 361.

At hearing on January 30, 2008, counsel for Defendant forwarded two legal arguments relating to the construction of this legal requirement. Each are without merit.

First, Defendant's attorney argued the requirement of objectively reasonable under the Mickens element mandated that Babineau not consider the facts known to him through his client. To do so, argued counsel, would be to impute a component of subjectivity into the test. This argument is unpersuasive in light of the guidepost of Strickland which requires the Court to consider an attorney's decisions from the point of view of the attorney at the time of the tactical decision based upon all of the information available to the attorney. Second, the clause construed states, "under the facts of the case known to the attorney at the time of the attorney's tactical decision." The clause does not state that the attorney shall willfully blind himself or herself from the comments or information provided by his or her client. To construe the test as requested by Defendant's counsel would be to torture the plain language of the clause and depart from Strickland and its progeny. Moreover, as the clause at issue regards "tactics" and "the attorney's tactical decision," the reasons for the attorney's actions must necessarily be assessed.

Second, Defendant's counsel asserts the Statement of Reasons, which shows the Court based its sentencing decision on Defendant's then apparent need to possess the firearm in self

defense, shows that the argument was objectively reasonable. This argument is unpersuasive as the test measures whether the tactic was "objectively reasonable under the facts of the case known to the attorney at the time of the attorney's tactical decision." Doc. 57 at 15 (citing Mickens, 240 F.3d at 361) (emphasis added). The test concerns whether the tactic was objectively reasonable to the attorney, Babineau, not whether it was later found persuasive by the Court. Clearly, Babineau was aware of facts weakening the self defense theory of which the Court was not aware at the time of the sentencing hearing.

### 3. *Measuring Performance From Counsel's Perspective at the Time*

Counsel's performance is to be measured "from counsel's perspective at the time," while "eliminat[ing] the distorting effects of hindsight." Strickland, 466 U.S. at 689-90. Moreover, "inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions . . . [and] other litigation decisions." Strickland, 466 U.S. at 691 (citation omitted). For example, "when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." Strickland, 466 U.S. at 691.

### C. Downward Departure Based on Self Defense

As mentioned, the Fourth Circuit has described the Court's obligation on remand to determine "whether it would have been objectively reasonable for Babineau to seek a downward sentencing departure based on necessity and self-defense." Doc. 57 at 8. Respecting this potential ground for a downward departure, U.S.S.G. § 5K2.12 provides, in full,

> If the defendant committed the offense because of serious coercion, blackmail or duress, under circumstances not amounting to a complete defense, the court may depart downward. The extent of the decrease ordinarily should depend on the reasonableness of

> the defendant's actions, on the proportionality of the defendant's actions to the seriousness of coercion, blackmail, or duress involved, and on the extent to which the conduct would have been less harmful under the circumstances as the defendant believed them to be. Ordinarily coercion will be sufficiently serious to warrant departure only when it involves a threat of physical injury, substantial damage to property or similar injury resulting from the unlawful action of a third party or from a natural emergency. Notwithstanding this policy statement, personal financial difficulties and economic pressures upon a trade or business do not warrant a downward departure.

U.S.S.G. § 5K2.12. While the only question before the Court concerns the propriety of a motion under U.S.S.G. § 5K2.12, the Court bears in mind the legal principles governing a justification defense in the Fourth Circuit, which are relevant because U.S.S.G. § 5K2.12 regards "circumstances not amounting to a complete defense." Thus, it is appropriate to understand what a complete defense would entail.

In United States v. Crittendon, 883 F.2d 326, 330-31 (4th Cir. 1989), while not ruling on the validity of the justification defense in the Fourth Circuit, the Fourth Circuit detailed its elements for the purpose of determining its relevance. The Court concluded:

> To be entitled to the defense of justification, the defendant must produce evidence which would allow the factfinder to conclude that he:
> (1) was under unlawful and present threat of death or serious bodily injury;
> (2) did not recklessly place himself in a situation where he would be forced to engage in criminal conduct;
> (3) had no reasonable legal alternative (to both the criminal act and the avoidance of the threatened harm); and
> (4) a direct causal relationship between the criminal action and the avoidance of the threatened harm.

Id. at 330 (citations omitted) (concluding the defense would not apply for failure to show an imminent threat of injury or death).

The Crittendon factors are helpful to the Court in assessing those separate factors outlined in U.S.S.G. § 5k2.12.

D. Ethical Obligations of Counsel

Attorneys appearing in criminal cases before the United States District Court for the

Eastern District of Virginia are governed by the Virginia Rules of Professional Conduct. LOCAL

CRIMINAL RULE 57.4(I). Several provisions in the Virginia Rules of Professional Conduct bear

upon the issues before the Court. First, Rule 1.1 provides, "A lawyer shall provide competent

representation to a client. Competent representation requires the legal knowledge, skill,

thoroughness and preparation necessary for the representation." VA. RULES OF PROF'L CONDUCT

R. 1.1. Bearing upon Rule 1.1 is the attorney's duty to develop a problem-solving approach

which includes effectively negotiating with the opposing side and thoroughly investigating the

case from a factual and legal standpoint. VA. RULES OF PROF'L CONDUCT R. 1.1 cmts. 2a, 5.

Rule 3.1 provides, in relevant part, "A lawyer for the defendant in a criminal proceeding . . . may

nevertheless so defend the proceeding as to require that every element of the case be

established." VA. RULES OF PROF'L CONDUCT R. 3.1. However, Rule 3.3 states, in part:

> (a) A lawyer shall not knowingly:
> (1) make a false statement of fact or law to a tribunal;
> (2) fail to disclose a fact to a tribunal when disclosure is necessary to avoid
> assisting a criminal or fraudulent act by the client, subject to Rule 1.16;
> . . .
> (4) offer evidence that the lawyer knows to be false. If a lawyer has offered
> material evidence and comes to know of its falsity, the lawyer shall take
> reasonable remedial measures.
> (b) A lawyer may refuse to offer evidence that the lawyer reasonably believes is false.

VA. RULES OF PROF'L CONDUCT R. 3.3. Similarly, Rule 4.1 provides, "In the course of

representing a client a lawyer shall not knowingly: (a) make a false statement of fact or law; or

(b) fail to disclose a fact when disclosure is necessary to avoid assisting a criminal or fraudulent

act by a client." VA. RULES OF PROF'L CONDUCT R. 4.1. Contrary to arguments of Defendant's

attorney, the Court is unaware of any ethical or legal rule requiring that a criminal defense

attorney forward a factual argument that the attorney knows to be false, based on the client's

statements to the attorney, though such factual argument may be supported by other evidence.

Rather, the Virginia Rules of Professional Conduct suggest the contrary is an attorney's ethical

obligation. Certainly, an attorney who knowingly presents factually untrue assertions risks

diminishing his or her credibility before the Court and seriously jeopardizes the welfare of his or

her client's case should the deception be uncovered by the Court or proven by the opposing party.


## V. ANALYSIS

The factual question for the Court to address on remand is whether Babineau's actual

conflict in representing both Butts and Nicholson adversely affected his performance at

Nicholson's sentencing hearing. "To establish an adverse effect, a § 2255 petitioner must satisfy,

by a preponderance of the evidence, a three-part standard." Doc. 57 at 15 (citing Mickens, 240

F.3d at 361). Thus, Nicholson must prove each of the following elements:

1.  There existed "a plausible alternative defense strategy or tactic that his defense counsel might have pursued;"
2.  "[T]he alternative strategy or tactic was objectively reasonable under the facts of the case known to the attorney at the time of the attorney's tactical decision;" and
3.  "[D]efense counsel's failure to pursue that strategy or tactic was linked to the actual conflict."

Doc. 57 at 15 (citing Mickens, 240 F.3d at 361). In consideration of the evidence submitted, the

Court **FINDS** Defendant has proven the first element but failed to prove by a preponderance of

the evidence elements two and three of the adverse effect test stated above.

## A. Objectively Reasonable

Defendant's evidence with respect to element two is unpersuasive for several reasons.

First, Babineau could not ethically present or argue facts to the Court which he knew were false. Notably, certain facts were already in the record in support of this self defense sentencing theory, including the Government's comments at the plea hearing and the Nicholson PSR. However, Babineau could not ethically file and pursue a motion for downward departure based on self defense as he knew that information was false in light of Defendant's comments to him and the federal agent.

Second, Defendant admitted to telling Babineau in a letter that he knew that he had no chance of winning the case at trial. Accordingly, Defendant's only opportunity to be sentenced below the mandatory one hundred and eighty (180) month term of imprisonment, was for the Government to seek a sentence reduction pursuant to Rule 35(b). Therefore, assisting the Government in the hope of receiving a reduction in sentence under Rule 35(b) was Defendant's primary objective throughout the litigation, as evidenced by the April 12, 2001 debriefing prior to his guilty plea as well as the September 4, 2001 debriefing following the sentencing. Part of the Government's analysis in assessing the usefulness of an informant is weighing that person's credibility. Had Nicholson asserted through a motion for downward departure at his plea hearing that he only possessed the firearm in self defense, while also telling federal agents that he was selling drugs during the time he possessed the gun, then Nicholson's credibility would have been damaged. This damage to his credibility could have reduced his prospect of having his sentence reduced under Rule 35(b).

Third, prior to Defendant's guilty plea, Nicholson told Babineau that he was not afraid of

Butts and possessed a gun because he was a drug dealer. Nicholson also told a federal agent on April 12, 2001 that he was dealing drugs during the time period when he was arrested. Babineau believed that the prosecutor was aware of what Nicholson had told the federal agent. Additionally, Babineau's testimony concerning Nicholson's comments to him about dealing drugs is corroborated by the fact that Nicholson told another federal agent shortly after his sentencing hearing about dealing drugs in Portsmouth since his return at the end of 2000. Accordingly, to present a downward departure motion on self defense, which could have been rebutted by Defendant's admissions of drug dealing to the federal agent, could have proven to be a serious tactical error in arguing the period of imprisonment Defendant should receive.

Based on this information, filing a motion for downward departure based on self defense was not objectively reasonable under the facts known to Babineau at the time of the tactical decision. Moreover, Defendant cannot argue that he is entitled to relief based on Babineau's conflict of interest, while simultaneously arguing Babineau should ignore ethical rules prohibiting him knowingly presenting false factual statements and arguments to the Court. Therefore, the Court **FINDS** Defendant has failed to prove by a preponderance of the evidence that a downward departure motion based on self defense was an objectively reasonable tactic under the facts known to Babineau at the time of the tactical decision.

### B. Link to the Actual Conflict

Further, Defendant has failed to show that Babineau's failure to file a downward departure motion based on self defense satisfies the third Mickens element through linkage to Babineau's representation of Butts. Babineau stated that his reason for not filing a downward departure motion based on self defense was based upon the abovementioned tactical and ethical

considerations, and not based upon his representation of Butts. While Babineau's decision to represent Butts and Nicholson indicates a lapse in judgment, it does not diminish Babineau's credibility before the Court. Babineau testified in person before the Court, and the Court had the opportunity to observe his manner and consider his testimony in light of the other evidence and testimony in the case. The Court found Babineau believable as a witness, despite the attempted attacks on his credibility by Defendant. Accordingly, because Babineau testified credibly that he failed to file and pursue a downward departure motion based on self defense due to various tactical and ethical considerations, and his testimony was consistent with the other evidence in the case, the Court **FINDS** Defendant has failed to meet his burden of proof on the linkage issue by a preponderance of the evidence.

## VI. CONCLUSION

For the reasons stated, Defendant's § 2255 Petition is **DENIED**.

The Clerk is **REQUESTED** to mail a copy of this Opinion and Order to all counsel of record and the Defendant.

It is so **ORDERED**.

HENRY COKE MORGAN, JR.
SENIOR UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
February 7, 2008